## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DIANE SLUSSER,

        Plaintiff,

v.                                               No. CIV 06-1193 JH/WDS

VANTAGE BUILDERS, INC.,

        Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER COMES** before the Court on Defendant's Motion for Summary Judgment, filed June 7, 2007 [Doc. 39].  The Court, having considered the motion, memoranda, and relevant law, and being otherwise fully informed, finds that the motion is well taken and will be granted.

### BACKGROUND[1]

Plaintiff was hired by RayLee Homes, Inc./Vantage Builders, Inc. on February 2, 2002, as "Operations Manager."  Plaintiff's job title was eventually changed from "Operations Manager" to "Assistant Controller."  Plaintiff did not have a college degree.  The position for which she was hired did not require any professional certifications, such as Certified Public Accountant, and did not require prior experience as a human resources director.

Scott Grady is the owner of RayLee Homes and Vantage Builders, Inc. ("VBI").  Vincent Pizzonia is part-owner of VBI.  Both Mr. Grady and Mr. Pizzonia owned various business entities in which Plaintiff performed work.

---

[1]  Except where otherwise noted, the following facts are undisputed or construed in favor of Plaintiff as the party opposing the motion for summary judgment.

Effective January 1, 2004, Plaintiff officially became an employee of VBI. On that date, the arrangement between RayLee Homes and VBI changed such that VBI became the entity that supplied administrative and executive services to RayLee homes for a fee.[2] Plaintiff continued to perform services for both companies through the date of her termination on February 16, 2006.

In May 2003, Mr. Grady hired Scott Porter as VBI's Chief Financial Officer. Mr. Porter is a Certified Public Accountant and negotiates terms and conditions of lending limits and lending lines. Mr. Porter also deals with upper level accounting, cash flow management, and profit analysis. Mr. Grady described Mr. Porter's duties as overseeing the operations downstairs, and taking care of all CFO duties, such as bank relations, cash flow management, analyzing the financials, negotiating the credit lines, and reading land contracts.

I.      Plaintiff's Duties.

Plaintiff did not have a written job description in her personnel file during the four years of her employment. The parties dispute whether Plaintiff's job duties were primarily clerical or managerial.

    A.      Clerical.

In support of her claim that her duties were clerical in nature, Plaintiff attaches her own affidavit. In it, Plaintiff indicates that she performed a number of functions for her employer that could be broken down into three areas: (1) preparing paperwork to request construction loans on homes built by her employer, (2) manually preparing and entering accounts payable information

---

[2] Prior to that, between February 2, 2002, and January 1, 2004, RayLee Homes and VBI operated pursuant to the terms of an agreement under which RayLee Homes provided certain administrative and executive services to VBI.

2

into accounting software, and (3) preparing and entering payroll information into payroll modules.

With respect to construction loans, Plaintiff manually would fill out a form and send it to pre-selected (by someone other than Plaintiff) title companies and appraisers.  After receiving in return a "title binder," Plaintiff manually reflected the work in the house file, where Plaintiff and other clerical employees logged in closing dates.

With respect to accounts payable, Plaintiff would receive invoices for products and services and manually code the invoices with a job number and code.  Plaintiff manually would enter this data, which included the vendor number, vendor name, invoice date, invoice number, invoice amount, job number, "GL" code, and description of service, into the accounting software system.  After entering the information into the computer, Plaintiff manually would alphabetize the invoices, run a total, and place the invoices in a file where she would eventually run a computer-generated report and print checks.  Plaintiff did not have the authority to sign these checks.

Also with respect to accounts payable, Plaintiff would gather purchase orders from individual house files for completed work.  Most homes had 60 or more purchase orders per house.  Similar to invoices for products and services, Plaintiff manually would record the delivery of the purchase order, enter the vendor number, and verify the job number and cost against the printed purchase order.  Plaintiff next would alphabetize the vendors, run a tape total for each vendor, and print a check (that she could not sign).

With respect to payroll, Plaintiff was required to run a report for sales commissions, manually log sales commissions onto a sheet of paper, and enter the information into a computer. Plaintiff also had to enter payroll information for hourly and salaried employees.  Thereafter,

3

Plaintiff was responsible for printing the checks that she could not sign.  After completion of these duties, Plaintiff would record and pay all payroll taxes, which also included significant data entry.

In support of her claim that her duties were primarily clerical, Plaintiff attaches the statements and testimony of four employees who indicated that Plaintiff performed clerical duties, that Plaintiff had little or no supervisory duties, and that the Mr. Porter made managerial decisions for the department.

For example, Betty Garland, an employee at RayLee/VBI from 1998 through 2006, worked closely with Plaintiff in a large room in the RayLee/VBI main office, where both had their own cubicles.  Ms. Garland stated that Plaintiff spent much of her time working on clerical duties, which included general accounting work similar to that of other clerical workers in the department.  Ms. Garland stated that while Plaintiff supervised clerical employees over a period of time, Plaintiff did the same type of clerical work as the employees she supervised.  Ms. Garland observed employees asking Plaintiff questions, which Plaintiff could answer because she was doing the same type of work.

Barbara Domingues was hired by VBI in 2001, and was familiar with Plaintiff's work. Ms. Domingues did not notice that Plaintiff had any managerial responsibility.  Rather, Ms. Domingues indicated that VBI vested the most managerial responsibility in its Chief Financial Officer Mr. Porter, who ran the department and instructed Plaintiff to do as he saw fit. According to Ms. Domingues, Plaintiff was a jack of all trades in the finance department where Mr. Porter was making all the management decisions.  Ms. Domingues stated that VBI would bestow meaningless titles on employees.

Deborah Pennebaker, employed by RayLee/VBI from October 2004 through February

4

2006, worked in a cubicle next to Plaintiff's cubicle.  VBI's CFO, Mr. Porter, in contrast, worked in an office in the "executive suites."  According to Ms. Pennebaker, Plaintiff had no supervisory duties.  Ms. Pennebaker admitted, however, that Plaintiff supervised her and delegated worked to her, but noted that Plaintiff was also performing the same type of accounts payable work that Ms. Pennebaker herself performed.  Ms. Pennebaker further stated that Plaintiff was not making any type of managerial decisions with regard to policy or issues in the accounting department.  Ms Pennebaker indicated that Mr. Porter was in charge of the accounting department and that he made it clear he was the CFO, controller of the company, and head of the department.  Ms. Pennebaker stated that Mr. Porter would direct her and other employees to do things in a manner contradictory to Plaintiff's instructions.  When questioned about the discrepancies, Mr. Porter indicated that it was he, and not Plaintiff, who was in charge of the department.  Ms. Pennebaker stated that Mr. Porter had more authority to direct her than Plaintiff.

Evangeline Vigil, an accounts payable clerk, worked for Defendant from April to December 2005.  During half of this time, she worked from the same cubicle as Plaintiff.  Ms. Vigil stated that Plaintiff did the same work that she performed.  Ms. Vigil further stated that Mr. Porter was in charge of the department, and that it was Mr. Porter who approved her overtime.  If Mr. Porter did not approve her overtime, Plaintiff would have to complete Ms. Vigil's work.  Ms. Vigil testified that before Plaintiff could assign her new responsibilities, Plaintiff would need to get permission from Mr. Porter.  Ms. Vigil conceded, however, that it was Plaintiff, and not Mr. Porter, who was her immediate supervisor, and that it was Plaintiff who supervised her work on a day-to-day basis.

Mr. Porter testified that at one point in November of 2005, it was he, rather than Plaintiff,

5

who had to oversee the accuracy of the data being entered by Plaintiff and employees who allegedly worked beneath her.  Apparently, at that time, Plaintiff was not following Mr. Porter's instructions with respect to certain worksheets or documentation Mr. Porter was requiring from Plaintiff to substantiate records.

       B.    <u>Managerial</u>.

       Defendant argues that Plaintiff's primary duties were managerial in nature, and in support of this cites the following evidence.  In his affidavit, Mr. Porter stated that as of May 1, 2003, when he began serving as VBI's CFO, he was informed and understood that Plaintiff and Brenda Waters had been co-managing all aspects of VBI's accounting department.  Mr. Porter further stated that at that time, VBI already recognized the accounts payable aspects of its business as a separate and distinct department within the company, with certain employees being dedicated exclusively to handling accounts payable work.  Plaintiff disputes Mr. Porter's contentions, pointing generally to 28 paragraphs in her opposition to the motion for summary judgment, without explaining which of the facts contained in these 28 paragraphs are meant to dispute Mr. Porter's statements.  Although it is impossible to discern with any certainty what facts Plaintiff disputes, it appears that Plaintiff disputes Mr. Porter's statement that she was co-managing the accounting department.  Some of the facts contained in the 28 paragraphs indicate that Plaintiff performed clerical duties, that Plaintiff had few supervisory duties, and that Mr. Porter made managerial decisions for the department.  It also appears that Plaintiff disputes that VBI dedicated employees exclusively to handling accounts payable work.  For example, Evangeline Vigil testified that Plaintiff did accounts payable work but that she also served as accounting clerk and dealt with construction loan requests.

       Plaintiff testified in her deposition that on or about December 1, 2003, she was placed in

charge of the accounts payable department of VBI.  In this role, Plaintiff testified that one of her job directives was to propose a plan for handling the functions of the accounts payable department.  Plaintiff disputes her prior testimony, pointing generally to 46 paragraphs of additional facts in her opposition as support.  Not one of these facts specifically refutes Plaintiff's testimony that VBI made a decision to place Plaintiff in charge of the accounts payable department on December 1, 2003.  Some of the facts, however, indicate that Plaintiff spent her time doing clerical duties, that Plaintiff had minimal supervisory duties, and that Mr. Porter made managerial decisions for the department.

Plaintiff testified that Mr. Porter emphasized Plaintiff's duties as a manager of the accounts payable department and her authority and responsibility to delegate tasks to the employees she supervised during reviews of her performance.  Mr. Porter specifically instructed Plaintiff to "stop being a doer" and to delegate work to the people she supervised.  Although Plaintiff claims these facts are disputed, citing generally to 51 paragraphs of additional facts in her opposition, she does not point to any specific evidence that refutes the fact that Mr. Porter instructed Plaintiff to delegate or that he emphasized her duties as a manager.

In his deposition, Mr. Porter testified that although he put Plaintiff in charge of the accounts payable department, he was frustrated with the fact that Plaintiff continued to spend time inputting data for the company.  In her November 2005 performance review, Mr. Porter indicated that Plaintiff was not delegating clerical tasks to employees underneath her but rather doing the work herself.  Mr. Porter indicated that most of Plaintiff's efforts needed to be given to reviewing the work of employees instead of doing the work herself.  Mr. Porter testified that because of Plaintiff's failures as a manager and her propensity to be entering data instead of managing, he was forced to spend 50 percent of his time addressing management issues that

7

Plaintiff should have been addressing.

Mr. Porter recognized in 2005 that the volume of work, which had doubled every year up until 2002, was, at times, overwhelming. At times, Mr. Porter would not allow Plaintiff to hire additional help and did not want hourly-wage employees to work overtime. If the work was not finished, Plaintiff was accountable. Even though Mr. Porter instructed Plaintiff to delegate the data entry work, if an employee did not finish her work in regular work hours, Plaintiff finished the work herself presumably because Plaintiff knew the work had to be completed.

In his affidavit, Mr. Porter stated that he did not directly supervise Plaintiff's day-to-day activities. Moreover, VBI employee Susan Harris testified that Plaintiff ran the accounting department and that Mr. Porter was the CFO.

In her deposition, Plaintiff testified that she attended weekly management meetings at VBI as well as management meetings outside of the State of New Mexico. In addition, Plaintiff participated in seminars for managers in Albuquerque and outside of New Mexico.

Plaintiff also testified in her deposition that she had full after-hours access to the company's premises and computer systems, and fully-paid use of a Blackberry communication device. These perquisites generally were reserved for higher-level employees. In addition, Plaintiff was a member of the audit committee within VBI, and that the committee was comprised of the company's highest level executives. Although Plaintiff claims that these facts are in dispute, pointing generally to 38 paragraphs in her opposition, she does not identify a single fact that actually refutes her deposition testimony.

In contrast, neither Ms. Vigil nor Ms. Pennebaker were given a Blackberry, asked to attend management meetings, or invited to attend seminars and training sessions. Moreover, Ms. Vigil was not allowed to remain on company premises after working hours unless Plaintiff, a

supervisor, was present.

Between February 2, 2002, and November 30, 2005, Plaintiff referred to herself in written documentation using the following titles: operational manager, operational controller, human resource manager, assistant controller, accounts payable manager, management, and manager. Although Plaintiff claims her self-proclaimed titles are in dispute (despite the fact that they are in written documents prepared by Plaintiff herself), citing generally to 51 paragraphs in her opposition, nothing in those 51 paragraphs refutes the fact that Plaintiff referred to herself with those titles.

II.      <u>Plaintiff's Direction of Employees</u>.

At her deposition, Plaintiff testified that she supervised employees like Erika Kerestes, Katie Porter, Judy Montoya, Deb Pennebaker, and Evangeline Vigil. Plaintiff referred to these employees as "my girls." She oversaw them for accounts payable and construction loans. Plaintiff testified that if these employees had questions, they would ask her for answers, and if they ran out of work, they would ask Plaintiff for additional work. Plaintiff testified that she had authority at times to instruct them what work to accomplish and to set the project deadlines. Plaintiff also had authority to supervise the employees' arrival and departure times. Plaintiff had authority, as directed by Mr. Porter, to discipline these employees. During the last full year, Plaintiff further had authority to evaluate the employees' job performance. (Prior to 2005, job evaluations were not given.) Mr. Porter testified that Plaintiff gave two employees evaluations. Plaintiff also made recommendations concerning salary increases, although one or two of Plaintiff's recommendations were not followed. Plaintiff further was involved in creating procedures for the employees she supervised.

Although Plaintiff claims the foregoing facts related to her supervision of various

9

employees are disputed, she does not point to any specific facts indicating that she did not refer to those she supervised as "my girls," answer the questions of employees, allocate employees' work and deadlines, monitor employees' arrival and departure, discipline employees, evaluate employees, and make recommendations for employees' salaries. Instead, Plaintiff points generally to 51 paragraphs of facts indicating that she spent her time performing clerical tasks, and that Mr. Porter made managerial decisions for the department. These general facts, however, do not dispute or negate the foregoing specific facts. Furthermore, the contradictory testimony of Ms. Pennebaker, who testified that Plaintiff had no supervisory duties but admitted that Plaintiff supervised her and delegated worked to her, does not negate Plaintiff's own testimony about the authority she did have.

Plaintiff also directed the work of various temporary employees utilized from time to time by RayLee Homes and/or VBI. Although Plaintiff claims this fact is disputed, pointing generally to fifteen paragraphs of additional facts in her opposition, she does not point to any specific facts indicating that she did not direct the work of temporary employees.

III.    Plaintiff's Salary.

    At all times during the term of her employment, Plaintiff was paid on a salary basis, with her salary ranging from $50,000 annually at the time she was hired, to $70,000 annually at the time her employment was terminated. At the time of her termination, Plaintiff was the second highest paid office employee in the company. Mr. Grady testified that Mr. Porter made $80,000 or $85,000 per year. In addition, Plaintiff was only one of a handful of VBI employees eligible to earn a bonus based upon the company's profitability. Plaintiff admitted that the bonuses for which she was eligible could have reached as much as $30,000 to $40,000 in her final year of employment. Plaintiff received a $5,000 bonus, which no other payroll clerk

10

received.

Ms. Vigil and Ms. Pennebaker, in contrast, made significantly less than Plaintiff. Defendant paid Ms. Vigil an hourly wage of $13.46.  Prior to August 15, 2005, Defendant paid Deb Pennebaker an hourly wage of $15.39.  From August 15, 2005, to December 2005, Defendant paid Ms. Pennebaker $16.50 per hour, and after December 2005, Defendant paid Ms. Pennebaker $17.16 per hour.  Defendant raised Ms. Pennebaker's salary based upon performance reviews conducted by Plaintiff, among others.  Unlike Plaintiff, neither Ms. Vigil nor Ms. Pennebaker were eligible for bonuses.

IV.    <u>Plaintiff's Role in Hiring and Firing Employees</u>.

Plaintiff testified that she and Mr. Porter were in charge of interviewing accounts payable clerks.  Ms. Vigil testified that Mr. Porter and Plaintiff interviewed her, and Ms. Pennebaker also testified that Plaintiff and Mr. Porter interviewed her.  Plaintiff also participated in the interview of a candidate for VBI's human resources director, although Plaintiff's duties did not include supervising the human resources director.  In addition, Mr. Porter indicated that Plaintiff had the authority to, and did in fact, hire and fire employees of VBI, and that VBI's upper-level executives gave Plaintiff's recommendations and opinions regarding hiring and firing weight.

Although Plaintiff claims these facts are disputed, pointing to over 30 paragraphs in her opposition, she does not identify any facts negating her testimony that she was involved in the interview process or Mr. Porter's statement that she played a role in hiring and firing employees.

Mr. Porter, and not Plaintiff, terminated Ms. Vigil's employment.  Ms. Vigil understood that the decision to terminate her was Mr. Porter's based upon a conversation he had with Plaintiff.  Ms. Vigil testified that Mr. Porter decided to terminate her over Plaintiff's objection.

An e-mail exchange between Plaintiff and Mr. Porter indicates that Plaintiff

recommended to Mr. Porter that the company hire an employee.  Mr. Porter's response to the e-mail indicates that he followed Plaintiff's recommendation, instructing Plaintiff to hire the employee if she thought it would help.

Plaintiff was involved, as HR Manager, in terminating employees, but there is no evidence that she supervised these employees.

## <u>STANDARD</u>

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'"  *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the movant will not bear the burden of proof at trial, this burden may be met by pointing to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).  Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

Defendant argues that Plaintiff was exempt from the FLSA's overtime compensation requirements. Under the FLSA, an employer must pay an employee overtime compensation unless that employee can be categorized as an "employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The employer carries the burden of proving applicability of the overtime pay exemption, and the overtime provisions are narrowly construed against the employer. *Spradling v. City of Tulsa, Okla.*, 95 F.3d 1492, 1495 (10th Cir. 1996); *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004) (citing *Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta*, 920 F.2d 800, 804 (11th Cir. 1991)).

Congress delegated the task of defining "executive, administrative, or professional capacity" to the Secretary of Labor ("Secretary"). *See* 29 U.S.C. § 213(a)(1). In August 2004, the Secretary revised the Department of Labor ("DOL") regulations defining the terms for the first time since 1974. As a general matter, the new regulations preserve the case law that existed

13

prior to that date by consolidating "the former regulations and interpretations into a unified set of rules and . . . provid[ing] needed simplification and more clarity to a complex regulation." *See* 69 F.R. 22122, 22127 (codified at 29 C.F.R. Pt. 541).

In order to meet the executive exemption under the new regulations,[3] an employee must (1) receive compensation on a salary basis at a rate of at least $455 per week; (2) have the primary duty of managing the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof; (3) customarily and regularly direct the work of two or more other full-time employees; and (4) have the authority to hire or fire other employees or have particular weight given to their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees.[4]  29 C.F.R. § 541.100.  The Court need not address the first requirement as it is undisputed that Plaintiff's salary was greater than $455 per week.

I.      Primary Duty of Management.

Under the regulations, "management" functions include activities such as interviewing,

_____

[3] Although Defendant contends that Plaintiff may also be exempt under the "administrative" and "professional" employee exemptions of the FLSA, Defendant limits its motion for summary judgment to Plaintiff's status as a bona fide "executive" employee.

[4] The revised FLSA regulations adopted by the Secretary of Labor in August of 2004 do not apply retroactively.  Accordingly, the Court is required to apply the prior version of the regulations in evaluating Plaintiff's employment prior to August of 2004.  *Cf. De Jesus-Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72, 74 n.2 (1st Cir. 2005).  Under the previous version of the regulations, an employer could apply a "short test" to determine whether an employee was exempt.  Under the short test, an employee was exempt if her primary duty consisted of (1) "the management of the enterprise . . . or of a customarily recognized department or subdivision," and (2) "the customary and regular direction of the work of two or more other employees."  29 C.F.R. § 541.1(f) (2001).  Because the two elements of the short test are included in the new amended regulations, Defendant focuses its supporting memoranda on an evaluation of whether Plaintiff qualifies as exempt under the current regulations.

selecting and training employees; setting and adjusting employees' rates of pay and hours of work; directing employee's work; maintaining production or sales records to use in supervision or control; appraising employees' work for the purpose of recommending promotions or other changes in status; planning the work; determining the techniques to be used; handling employee complaints and grievances; disciplining employees; apportioning work among employees; and providing for the safety of employees and property. *Id.* § 541.102. The determination of whether an employee has management as her primary duty must be based on all the facts in a particular case. *Id.* § 541.700(a).

The undisputed evidence indicates that Plaintiff was involved in the following activities, among others. Plaintiff participated in the interviewing and selection of employees. Plaintiff also was responsible for answering employees' questions, which is a form of training employees. In addition, Plaintiff assigned work to employees, directed the work of employees, apportioned work among employees, and disciplined employees. Furthermore, Plaintiff was involved in appraising employees' work for the purpose of recommending promotions or other changes in status, and she also made recommendations concerning salary increases and terminations of employees. In addition, one of Plaintiff's job directives was to propose a plan for handling the functions of the accounts payable department, which is akin to forming a plan for the work of the department or determining the techniques to be used in the department. Plaintiff also was involved in creating procedures for the employees she supervised. Although the evidence did not indicate that Plaintiff set or adjusted employees' hours of work, it did indicate that she supervised employees' arrival and departure times. The Department of Labor Regulations have included each of the foregoing functions in the description of "management" activities. *Id.* § 541.102.

The list of management activities described in the regulations is not exhaustive, and the Court therefore may consider other evidence indicating that Plaintiff was involved in management activities.  The undisputed evidence indicates, for example, that Plaintiff supervised other employees.  *Cf. Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1981) ("The supervision of other employees is clearly a management duty.") (citation omitted).  Plaintiff also attended weekly management meetings at VBI, management meetings outside of New Mexico, and in-state and out-of-state seminars for managers.  In addition, Plaintiff was a member of the audit committee within VBI, which was comprised of the company's highest level executives.  Plaintiff also had full after-hours access to the company's premises and computer systems, and the fully-paid use of a Blackberry communication device, all of which were perquisites generally reserved for higher-level employees.  Furthermore, between February 2, 2002, and November 30, 2005, Plaintiff referred to herself in written documentation using the following titles: operational manager, operational controller, human resource manager, assistant controller, accounts payable manager, management, and manager.

The Court concludes that the foregoing duties constitute management activities within the meaning of the Department of Labor regulations.  Plaintiff points to evidence, however, that demonstrates that she spent a substantial amount of her time performing clerical duties.  The question for the Court then becomes whether Plaintiff's management duties were primary.  29 C.F.R. § 541.100(a)(2).

The Court must construe the facts in Plaintiff's favor as the party opposing the motion for summary judgment.  The facts demonstrate that Plaintiff spent most of her time performing clerical, and not managerial, duties.  Plaintiff stated in her affidavit that she performed a number of functions for her employer that could be broken down into three areas, all of which are

16

clerical:  (1) preparing paperwork to request construction loans on homes built by her employer, (2) manually preparing and entering accounts payable information into accounting software, and (3) preparing and entering payroll information into payroll modules.  In addition, Betty Garland testified that Plaintiff spent much of her time working on clerical duties, which included general accounting work similar to that of other clerical workers in the department.  Deborah Pennebaker testified that although Plaintiff supervised her and delegated worked to her, Plaintiff was also performing the same type of accounts payable work that she herself performed.  Evangeline Vigil, an accounts payable clerk, testified that Plaintiff did the same work that she performed.  Mr. Porter recognized that Plaintiff was spending her time inputting data instead of managing the department.  This evidence, when construed in Plaintiff's favor, indicates that Plaintiff spent the majority of her time performing clerical duties.

Even though the evidence construed in Plaintiff's favor indicates that she spent more than 50 percent of her time performing non-exempt work, the amount of time spent on managerial duties, although a useful guide, is only one factor to consider in identifying an employee's primary duty for purposes of determining whether the employee is subject to the FLSA's executive exemption from overtime pay requirements.  *Ferrell v. Gwinnett County Bd. of Educ.*, 481 F. Supp. 2d 1338, 1344 (N.D. Ga.2007) (citations omitted).  Generally, primary duty means that the employee is performing managerial duties during a major part, or over 50 percent, of the employee's time.  *Jackson v. Advance Auto parts, Inc.*, 362 F. Supp. 2d 1323, 1333 (N.D. Ga.2005) (citation omitted).  "Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support

17

such a conclusion."  29 C.F.R. § 541.700(b).  Courts regularly have found that management

duties are primary even when the employee spends the vast majority of her time on non-exempt

activities.  *Cf. Jackson v. Jean Coutu Group (PJC) USA, Inc.*, No. CV206-194, 2007 WL

1850710, *5 (S.D. Ga. June 26, 2007) (granting summary judgment in favor of the employer on

the issue of the bona fide executive exemption where the manager claimed management was not

her primary duty on the ground that she performed non-exempt duties substantially the same as

those performed by hourly wage employees 95 percent of the time); *Baldwin v. Trailer Inns.,

Inc.*, 266 F.3d 1104, 1113-14 (9th Cir. 2001) (concluding that managers responsible for "making

the relatively important day-to-day decisions of the facility and providing for the safety of those

in the property" had management as their most important duty despite the claim of spending 90

percent of their time performing non-exempt tasks); *Moore v. Tractor Supply Co.*, 352 F. Supp.

2d 1268, 1273-74 (S.D. Fla. 2004) (finding a manager's primary duty management even though

95 percent of the time the manager performed non-exempt tasks), *aff'd* 140 Fed. Appx. 168 (11th

Cir. 2005); *Rau v. Darling's Drug Store, Inc.*, 388 F. Supp. 877, 879, 881 (W.D. Pa. 1975)

(concluding that employee who was "in charge" of a drug store had management as her primary

duty despite the fact that she also was the sole sales clerk in two departments and did a

considerable amount of routine, non-exempt work).

       The Court must balance the following factors, among others, to determine whether

Plaintiff's management duties were primary:  "the relative importance of the exempt duties as

compared with other types of duties; the amount of time spent performing exempt work; the

employee's relative freedom from direct supervision; and the relationship between the

employee's salary and the wages paid to other employees for the kind of nonexempt work

performed by the employee."  29 C.F.R. § 541.700(a).

18

The first factor, the relative importance of the exempt duties as compared with other types of duties, weighs in favor of finding Plaintiff's management duties primary. Although Plaintiff spent significant time preparing paperwork and entering data, she was one of many employees to complete this work. Relatively speaking, therefore, the work was less important than Plaintiff's managerial duties. There was no evidence in the record that anyone other than Plaintiff had the duty of assigning work to the employees she supervised, directing the work of these employees, apportioning the work among these employees, and answering the questions of these employees. These management duties, vested solely in Plaintiff, were more important than the data entry duties undertaken by Plaintiff and many lower-level employees at VBI. Plaintiff's management duties were also indispensable for the day-to-day operations of the payroll department. The evidence indicates that although Mr. Porter had authority over Plaintiff, it was Plaintiff, and not Mr. Porter, who supervised the day-to-day activities of the payroll clerks. Without this supervision, the payroll department could not have continued its day-to-day operations. Accordingly, Plaintiff's managerial duties outweigh Plaintiff's non-managerial duties. This factor, therefore, weighs in favor of finding Plaintiff's managerial duties primary.

The Court already has concluded that the second factor, the amount of time spent performing exempt work, weighs in favor of finding Plaintiff's clerical duties primary. The Court notes, however, that the time spent on clerical activities is mitigated by the fact that Defendant instructed Plaintiff to delegate her clerical duties to others and to focus her attention on managing and reviewing the work of others.

The third factor, the employee's relative freedom from direct supervision, weighs marginally in favor of finding Plaintiff's duties primarily clerical. The evidence indicates that VBI vested the most managerial responsibility in Mr. Porter, who ran the department and

instructed Plaintiff to do as he saw fit, that Mr. Porter was in charge of the accounting department and that he made it clear he was the CFO, controller of the company, and head of the department, and that when Mr. Porter's directions contradicted Plaintiff's, Mr. Porter indicated it was he, and not Plaintiff, who was in charge of the department. Although this evidence does not directly address the question of Plaintiff's relative freedom from direct supervision, when construed in Plaintiff's favor, it does tend to show that Plaintiff was accountable to, and directly supervised by, Mr. Porter.

Defendant produced evidence in rebuttal, including Mr. Porter's affidavit indicating that he did not directly supervise Plaintiff's day-to-day activities and that Plaintiff's department "was essentially hers to run." Moreover, employee Susan Harris testified that Plaintiff ran the accounting department and that Mr. Porter was the CFO. Defendant also produced evidence indicating that it was Plaintiff who assigned work to employees, directed the work of employees, apportioned work among employees, answered questions of employees, and disciplined employees, and there was no evidence indicating that Mr. Porter was involved in any of these day-to-day tasks. The Court, however, must resolve all factual disputes and construe all inferences in Plaintiff's favor. In so doing, the Court concludes that on balance the factor weighs slightly in favor of Plaintiff.

The fourth factor, the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee, weighs strongly in favor of finding Plaintiff's duties primarily managerial. Plaintiff was paid on a salary basis, with her salary ranging from $50,000 annually at the time she was hired, to $70,000 annually at the time her employment was terminated. At the time of her termination, Plaintiff was the second highest paid office employee in the company. In addition, Plaintiff was only one of a handful of

20

VBI employees eligible to earn a bonus based upon the company's profitability.  Plaintiff admitted that the bonuses for which she was eligible could have reached as much as $30,000 to $40,000 in her final year of employment.  Plaintiff did receive a $5,000 bonus, which no other payroll clerk received.

Ms. Vigil and Ms. Pennebaker, in contrast, made significantly less than Plaintiff.  Defendant paid Ms. Vigil, for example, an hourly wage of $13.46, and Ms. Pennebaker's final hourly rate was $17.16 per hour.  Based upon a 40-hour work week, these hourly wages amount to a salary of between $28,000 and $36,000 per year.  In addition, neither Ms. Vigil nor Ms. Pennebaker were eligible for bonuses.  Plaintiff's salary, therefore, was significantly higher than that earned by the clerks performing comparable non-managerial duties.  *Cf. Jackson*, 2007 WL 1850710, at *4.  Plaintiff further was eligible for bonuses based upon the company's profitability.  *Cf. id.*  This factor, therefore, weighs strongly in favor of finding Plaintiff's duties primarily managerial.

In the current regulations, the DOL has included analysis of "Concurrent Duties" to address the special circumstances of working supervisors.  29 C.F.R. § 541.106.  This section provides that an employee does not lose her exempt status merely because she performs exempt and non-exempt work at the same time.  In order to retain the exemption, however, management must be the primary duty.  Whether an employee retains her exempt status when the employee performs concurrent duties is determined on a case-by-case basis and based on the four factors set forth above.  *Id.* § 541.106(a).  "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work.  In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or

21

performs the exempt work for defined time periods." *Id.*

The evidence indicates that it was Plaintiff's decision to perform non-exempt work, and that Plaintiff used her own judgment to decide when to undertake non-managerial work. Plaintiff testified that she performed clerical work when Mr. Porter decided not to hire additional employees or grant payroll clerks' overtime requests. Knowing the work needed to be completed, Plaintiff chose to input the data herself. Presumably, Plaintiff did so because, as manager of the accounts payable division, she was accountable for the work being completed. In any event, Defendant did not instruct Plaintiff to perform clerical work. To the contrary, Defendant recognized that Plaintiff was performing clerical duties and wanted her to perform fewer of these duties. In her November 2005 performance evaluation, for example, Mr. Porter indicated that most of Plaintiff's efforts needed to be given to reviewing the work of employees instead of doing the work herself.

Plaintiff undertook clerical work on her own initiative, and, in contravention of her employer's wishes. Moreover, while she performed clerical work, Plaintiff was still responsible for her managerial duties. Therefore, Plaintiff more closely resembles an exempt executive. *Cf. id.* This fact, combined with the fact that two of the four factors weigh heavily in favor of Defendant, compels the Court to conclude that Plaintiff's duties were primarily managerial in nature.

Plaintiff's arguments to the contrary do not persuade the court otherwise. Plaintiff points to evidence indicating that Mr. Porter ultimately was in charge of the accounting department as the CFO. Simply because Plaintiff herself was accountable to Mr. Porter does not mean that Plaintiff could not also have primary management duties. Organizations regularly have mid-level managers who must answer to higher-level executives.

22

Plaintiff also argues that her duties were not primarily managerial because there was no legitimate accounts payable department of which Plaintiff was in charge.  In support of her argument that no accounts payable department existed, Plaintiff points to the following facts:  (1) although Plaintiff had the ability to delegate certain tasks, she was nevertheless performing the same type of work of clerical employees, (2) Ms. Domingues testified that she never observed Plaintiff to have any managerial discretion, (3) Ms. Pennebaker testified that Mr. Porter made it clear he was in charge of the accounting department, controller of the company, and head of the department, and that when his instructions contradicted Plaintiff's, he was in charge, and (4) Ms. Vigil testified that Mr. Porter was truly in charge, and that although Plaintiff gave her certain directions, Plaintiff performed the same type of work as Ms. Vigil.  Plaintiff argues that although she had some duties of delegation and sat in on hiring and firing decisions, it ultimately was Mr. Porter who ran the accounting department.

None of the facts raised by Plaintiff support her argument that no legitimate accounts payable department existed.  As the Court already has explained, the fact that Plaintiff was accountable to someone with more authority than she had does not negate the authority Plaintiff did have.  Furthermore, case law and regulations repeatedly indicate that the fact that a manager may have the same duties as hourly-wage employees they supervise does not alone render the manger's duties non-exempt.  Indeed, courts have found management duties primary even where managers have spent 90 or 95 percent of their time performing non-exempt work.  *Cf. Jackson*, 2007 WL 1850710, at *5 (finding management duties primary even though manager performed non-exempt duties 95 percent of the time); *Baldwin*, 266 F.3d at 1113-14 (finding management duties primary even though manager spent 90 percent of time performing non-exempt tasks); *Moore*, 352 F. Supp. 2d at 1273-74 (finding a manager's primary duty management even though

spent 95 percent of time performing non-exempt tasks).

II.      Supervision of Employees.

In order to meet the executive exemption under the new regulations, Defendant must demonstrate that Plaintiff customarily and regularly directed the work of two or more other full-time employees.  29 C.F.R. § 541.100(a)(3).  The regulations define "customarily and regularly" as "a frequency that must be greater than occasional but which, of course, may be less than constant."  *Id.* § 541.701.

At her deposition, Plaintiff testified that she supervised full-time employees like Erika Kerestes, Katie Porter, Judy Montoya, Deb Pennebaker, and Evangeline Vigil.  Plaintiff referred to these employees as "my girls."  Plaintiff assigned work to these employees, directed the work of the employees, apportioned work among the employees, set deadlines for the employees, answered questions of the employees, disciplined the employees, supervised the employees' arrival and departure times, evaluated the employees' job performance, made recommendations concerning salary increases, and created procedures for the employees.  Plaintiff's duties in this regard were not occasional, but rather regular and customary.  Although Plaintiff may have spent the majority of her time completing the same work as the employees she supervised, she did not abdicate her supervisory duties while she was engaged in her clerical duties.  Furthermore, the fact that Mr. Porter may have contradicted Plaintiff's instructions at times, and indicated that he was ultimately in charge, does not negate the fact that Plaintiff had supervisory responsibility. Likewise, the fact that in one month Mr. Porter may have indicated that he was ultimately responsible for overseeing the accuracy of the data entered into the system by Plaintiff and her employees, does not negate Plaintiff's supervisory responsibility.  Accordingly, the Court concludes that Defendant has satisfied its burden of demonstrating that Plaintiff customarily and

24

regularly directed the work of two or more other full-time employees.[5]

III.   Hiring and Firing Employees.

In order to meet the final requirement of the executive exemption test, Defendant must demonstrate that Plaintiff had the authority to hire or fire other employees, or that Plaintiff's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given "particular weight."   *Id.* § 541.100(a)(4).

Defendant does not argue, and the evidence does not indicate, that Plaintiff had the sole authority as to hiring, firing, or promotions.  Therefore, the Court must determine whether Defendant has demonstrated that Plaintiff's recommendations with respect to hiring, firing, advancement, promotion, and other changes of status were given "particular weight."  The regulations provide as follows:

> To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.  Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs.  It does not include an occasional suggestion with regard to the change in status of a co-worker.  An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

---

[5] Because Defendant has satisfied both the requirements of the bona fide executive exemption short test, *see supra* note 4, to the extent Plaintiff brings claims prior to August 2004, the Court finds in favor of Defendant on those claims as a matter of law.  Defendant has established that Plaintiff meets the requirements of a bona fide executive with respect to any claims predating August 2004.

29 C.F.R. § 541.105.

Defendant has satisfied its burden of proof of demonstrating that it gave Plaintiff's recommendations regarding hiring, firing, advancement, or promotion of the employees she supervised particular weight. The evidence clearly indicates that it was part of Plaintiff's job to make suggestions and recommendations. Plaintiff herself testified that she and Mr. Porter were in charge of interviewing accounts payable clerks, and Ms. Vigil and Ms. Pennebaker confirmed that both Plaintiff and Mr. Porter interviewed them. When Plaintiff sent Mr. Porter an e-mail recommending that the company hire an employee, Mr. Porter told Plaintiff to hire the employee if she thought it would help. Likewise, Plaintiff played a role in terminating employees. Even though Plaintiff presented evidence that Mr. Porter decided to terminate Ms. Vigil over Plaintiff's objection, the regulations provide that an employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status. *See id.* Finally, the evidence demonstrates that Plaintiff's job included giving written evaluations of the employees she supervised. In 2005, when Defendant began evaluating its payroll clerks, it became Plaintiff's job to participate in the evaluations.

Defendant also presented evidence indicating that Plaintiff frequently made recommendations regarding the hiring, firing, advancement, or promotion of the employees she supervised. As the Court already has noted, the evidence in the record indicates that Plaintiff was involved in the hiring of payroll clerks. And, there is no contrary evidence in the record indicating that payroll clerks were hired without Plaintiff's recommendation or participation. Indeed, Plaintiff does not present any argument in her response to the Motion for Summary

Judgment regarding Defendant's claim that it gave Plaintiff's recommendations particular weight. To the contrary, Plaintiff limited her response to the Motion to the question whether her duties were primarily managerial.

Likewise, the evidence also shows that Plaintiff frequently made recommendations with respect to terminating employees and with respect to the performance of employees. Mr. Porter testified that Plaintiff had the authority to, and did in fact, fire employees of VBI. And, Plaintiff admitted that once employee evaluations began in 2005, one year prior to her departure, Plaintiff evaluated three employees she supervised. There is no contrary evidence in the record indicating that Plaintiff's recommendation was not considered with respect to the evaluation of any employee Plaintiff supervised. Accordingly, the Court concludes that Defendant satisfied its burden of demonstrating that Plaintiff frequently made hiring, firing, and performance recommendations with respect to the employees she supervised.

Although the first two factors weigh in Defendant's favor, the third factor does not. The evidence before the Court regarding the frequency with which Defendant followed Plaintiff's recommendations indicates that Defendant followed Plaintiff's recommendation with respect to Judy Montoya, but that it did not follow her recommendations with respect to Deb Pennebaker and Evangeline Vigil. Although an e-mail exchange indicates that Plaintiff recommended hiring a temporary employee, and that Mr. Porter followed Plaintiff's recommendation, other evidence indicates that Mr. Porter decided to terminate Ms. Vigil, over Plaintiff's objection. This evidence, on balance, does not indicate that Defendant frequently followed Plaintiff's recommendations. To the contrary, it indicates that although Defendant followed Plaintiff's recommendations on two occasions, it declined to follow her recommendations on three occasions. As such, the Court cannot conclude that this factor weighs in Defendant's favor.

27

Two out of three factors, however, do weigh in favor of Defendant.  The Court therefore concludes that Defendant has satisfied its summary judgment burden of showing that Defendant gave particular weight to Plaintiff's recommendations.

## **CONCLUSION**

For the foregoing reasons, **IT THEREFORE IS ORDERED** that Defendant's Motion for Summary Judgment, filed June 7, 2007 [Doc. 39], is hereby GRANTED.


Dated this 6th day of February 2008.


JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE